# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

PAUL H. CROSSMAN, JR.,

                                      Plaintiff,

       v.                                       3:14-CV-1294
(ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

PETER A. GORTON, ESQ., for Plaintiff
LAUREN MYERS, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### MEMORANDUM-DECISION and ORDER

In accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and

N.D.N.Y. Local Rule 73.1, this matter was referred to me, with the consent of the

parties, for all proceedings and entry of a final judgment, by the Honorable Lawrence E.

Kahn, Senior United States District Judge, by Order dated July 27, 2015 (Docket No.

18).

## I.    PROCEDURAL HISTORY

On, July 27, 2009, plaintiff protectively[1] filed applications for both Disability

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date. In this case the protective filing date of February 7, 2011 is listed on the first page of each of the Disability Determination and Transmittals, dated April 15, 2011. (T. 60, 67).

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (T. 238).

Defendant alleges that plaintiff is claiming disability beginning October 28, 1984.

(Def.'s Br. at 1) (Dkt. No. 17). However, the Disability Field Report indicates

"potential" onset dates of "7/27/09" and "11/17/07." (T. 237). Plaintiff's counsel

indicates that although plaintiff alleges that his disabling injury occurred in 1984, his

disability for purposes of Social Security did not begin until January 1, 2008 because

plaintiff engaged in substantial gainful activity from 1984 until the end of 2007.[2] (Pl.'s

Br. at 1) (Dkt. No. 13). Thus, plaintiff requests that the court consider the period

between January 1, 2008 to "DATE." (Pl.'s Br. at 1).

Plaintiff's claims were denied initially and on reconsideration on November 12,

2009 and March 23, 2010 respectively. (T. 114-18, 119-25, 127-32, 207-209). Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ") which was conducted

by ALJ Robert E. Gale on February 1, 2011. (T. 90-113, duplicate transcript at 537-60).

ALJ Gale held another hearing on June 23, 2011, at which Vocational Expert ("VE")

Esperanza Distefano testified.[3] (T. 33-89, duplicate transcript at 537-60). ALJ Gale

issued an unfavorable decision on September 23, 2011. (T. 13-32, duplicate decision at

473-92). The Appeals Council denied plaintiff's request for review of the ALJ's

---

[2] The Disability Field Report contains this explanation for the "potential" onset date. (T. 238).

[3] Plaintiff did not appear at the June 23, 2011 hearing, but his attorney was present to cross-examine the VE.

decision on May 8, 2012 (T. 1-6, duplicate decision at 493-98). Plaintiff appealed the Commissioner's final decision to the United States District Court for the Northern District of New York, and on October 24, 2012, the parties stipulated to a remand for further administrative proceedings. (T. 499-502). On November 27, 2012, the Appeals Council ordered a remand to ALJ Gale for further proceedings. (T. 503-508).

On March 27, 2013, ALJ Gale held a video hearing at which plaintiff and VE Linda Vause testified. (T. 421-72). On May 17, 2013, ALJ Gale issued an unfavorable decision, which became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on September 17, 2014. (T. 393-420, 386-90).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or Supplemental Security Income ("SSI") disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or

whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

4

whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his

conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  **FACTS**

Plaintiff was born on February 26, 1965 and was forty-nine years old at the time of his most recent ALJ hearing on September 17, 2014.  In 1984, when plaintiff was nineteen years old, plaintiff sustained an injury at work in which he crushed his left hand in a wood-splitter. (T. 750-55).  The fingers on plaintiff's left hand were severed from his thumb to his ring finger,[4] leaving only his pinky finger intact. (T. 750). Initially, the surgeon attempted to reattach the fingers (T. 751-52), but the implants were not successful and had to be amputated several days later at the original sites of the injury. (T. 753-55).  Plaintiff is right-hand dominant.  As stated above, although plaintiff's application indicates that the date of onset of his disability is 1984, the application also lists a "potential date of onset" in late 2007, and plaintiff states in his brief that he is only requesting benefits as of the beginning of 2008 because he acknowledges that he engaged in substantial gainful activity for many years between 1984 and 2007.[5] (*See* Pl.'s Br. at 1).

---

[4] The amputation was "diagonally across the left hand from about 2cm. proximal to the MP joint of the thumb to just distal to the MP joint of the ring finger. Little finger was intact." (T. 751).

[5] Plaintiff is applying for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  The earliest month that SSI benefits may be paid is the month following the month in which the application for SSI was filed. 20 C.F.R. § 416.335.)  Plaintiff was "insured" for purposes of DIB until June 30, 2013. (T. 399).

In addition to plaintiff's hand injury, plaintiff suffers from a learning disorder, borderline IQ, and depressive disorder. (T. 400). At plaintiff's most recent hearing, plaintiff testified that he finished the ninth grade in school and has also studied auto mechanics. (T. 427-28). Plaintiff testified that he could still do some car repairs such as taking out a plug, draining the oil, or replacing a filter. (T. 428). The ALJ asked plaintiff about all of the work that he had done until 2007, including the skills and physical requirements involved in each of the jobs. (T. 430-38). Plaintiff testified that in 2007, he worked for a company in Kentucky. He started as a laborer, but he was promoted to a foreman's position in which he supervised fifteen to twenty employees. (T. 430-32). Prior to that job, plaintiff worked for a company installing hardwood flooring. (T. 433). Plaintiff stated that he had not worked since 2009. (T. 438).

In response to the ALJ's questioning, plaintiff stated that the "most significant medical condition" that keeps him from working is the amputation of the fingers in his left hand. He specifically testified that "it's the only thing I got to keep me from working." (T. 439). Plaintiff testified that he had never been hospitalized "at all" for mental health reasons since 1984. (T. 440). He does not attend any mental health counseling, and is not taking any prescription medications for any mental impairment. (*Id.*)

He lives with his brother and sister-in-law. (T. 426-27). He helps his brother by vacuuming. He can do his own laundry, make meals, take care of his personal hygiene

7

needs,[6] and can drive a motor vehicle by himself.[7] (T. 441). Plaintiff testified that he had never been in "rehab" for alcohol, and though he claimed to only smoke marijuana once or twice per year, he stated that he "smoked a bowl yesterday with a friend." (T. 443).

Plaintiff testified that he does not read very well, and if he gets papers from the Social Security Administration, he has a family member read the documents for him. (T. 444). Plaintiff testified that he was fired from various jobs because he had disagreements with other employees or supervisors and he often had an "attitude problem," particularly when he thought things at work were "unfair." (T. 432, 445, 446-47). Plaintiff claimed that he would see inequity in how people were treated and he was chastised for mentioning it.[8] (*Id.*) Plaintiff stated that he had a variety of "short" jobs. (T. 447). Plaintiff also testified that he was often slower than other employees. (T. 446-47).

The VE described plaintiff's past relevant work based on the plaintiff's

---

[6] Plaintiff testified that it took him longer to take care of his personal needs, like bathing, shampooing, and shaving, but that he does it all. (T. 441).

[7] In fact, plaintiff testified that the week before the hearing, he drove his brother's 4-wheeler around. (T. 441). However, plaintiff also testified that his license was suspended because of failure to pay child support. (T. 426). He also testified that his "problem" with Social Services was his failure to pay child support. (T. 447).

[8] Plaintiff stated that he was fired from his foreman's job because he went to the cafeteria when he was told not to go, and his boss "had to let me go." (T. 432-33). Plaintiff referred to this as an "attitude problem." (T. 446).

description of how he performed the job and upon the VE's knowledge of how the job is performed in the national economy. (T. 450-51). The VE testified that plaintiff had transferable skills from his carpenter/woodworking/supervisor position as well as from his hardwood floor installer position. (*Id.*) The ALJ asked a hypothetical question, in which he asked the VE to assume that the plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently with the right dominant hand, using the left hand primarily to steady the load being lifted and carried. (T. 452). The hypothetical further assumed that plaintiff could sit, stand, and walk six out of eight hours; and could push and pull ten pounds occasionally, but less than ten pounds frequently with his left hand and upper extremity. (*Id.*) His right hand and finger dexterity was intact. Plaintiff could not climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. He could constantly reach overhead, and there were no limits on feeling except for his left hand and fingers. (T. 452-53). Plaintiff could occasionally handle and feel with his left hand, but never finger with that hand. (T. 453).

Mentally, plaintiff had a mild limitation in understanding, remembering, and learning new tasks. (T. 453). He has a mild difficulty with attention, attending to a routine, and maintaining a schedule. Plaintiff could make "appropriate, simple, decisions" and interact appropriately with others. The VE testified that plaintiff could not perform his prior work, but could perform jobs such as bakery worker/conveyor

line. (T. 454). The VE testified that there were 235,910 jobs nationally, and 3,880

statewide, but there was no data available for the Binghamton area. (T. 454). The VE

also identified the job of cleaner/housekeeper. (T. 455). Nationally, there were 877,980

jobs in this category, 60,380 statewide, and 490 regionally.

In a second hypothetical, the ALJ added the limitation that plaintiff could only

"occasionally" interact with the public and co-workers, keeping all the other abilities

the same. (T. 455). The VE testified that the two jobs would still be available. (T. 456).

The third hypothetical added further mental limitations including moderate difficulties

in making judgments on simple work-related decisions, marked limitation in

understanding and remembering complex instructions, carrying out complex

instructions, making judgments on complex work-related decisions, and marked

limitations in interacting appropriately with the public. (T. 456). With these additional

limitations, the VE testified that there were no jobs that plaintiff could perform. (T.

457).

Plaintiff's attorney then questioned the VE regarding the number of jobs that

were available from the first two hypothetical questions. (T. 461-69). The VE testified

that the cleaner/housekeeper position would require "occasional fingering." (T. 461).

The plaintiff's attorney asked the VE whether the required "fingering" was "bilateral."

At first, the VE said "[t]hat would be my understanding," but then stated that "it's not

defined as bilateral. It just says occasional fingering." (T. 461). Plaintiff's attorney

asked/stated that if one did not have the ability to finger "bilaterally," then "at best there would be erosion, at worst, there wouldn't be any jobs." (T. 462). The VE agreed with the attorney's assessment. (*Id.*)

The plaintiff's attorney questioned the VE on the specific number of jobs that would available. (T. 466-67). The plaintiff's attorney asked the VE if she had "employment numbers for the entire census group or OES Group that this DOT number is a part of?"[9] (T. 466). The VE stated that the OES Group for the bakery worker job was "production workers - all other," and that nationally, there were 235,910 jobs in this category; and statewide it was 3,880 jobs, but there was no regional data. (T. 467). However, these numbers apply to 1,587 different DOT titles. Counsel then asked the VE to narrow the inquiry to the one baker title out of the 1,587 that the VE said plaintiff could perform. The VE testified that, for that one title only, there would be 261 jobs nationally and 4 in the state. (T. 467). Plaintiff's attorney also asked the VE to narrow the employment numbers for the housekeeper/cleaner position. (T. 462-63). The VE testified that there were 132,291 jobs nationally; 7,591 in the State; and 74 in the region. (T. 463).

The plaintiff's attorney continued to question the VE, and the VE testified that both jobs would still be available if plaintiff had a less-than-fifth grade reading level. (T. 468). The VE testified that a 10% reduction in pace would not affect either job, but

[9] "OES" stands for "Occupational Employment Statistics."

a 15% reduction in pace would eliminate both jobs. (T. 466). Plaintiff's attorney then asked about the bilateral nature of the handling requirements. (T. 469). When handling was limited to "less than occasional," the VE testified that the baker title would be eliminated. (T. 469). Finally, the VE testified that even if plaintiff were limited to no fingering, but occasional handling, the bakery/worker/conveyer position would still be available. (T. 470).

Plaintiff does not have any treating physicians for his various disorders, and in addition to the hospital records associated with plaintiff's hand injury, the record consists of a psychological assessment, dated in 1978, from plaintiff's school, discussing his learning disability, together with various mental and physical consultative examinations that were conducted between 2009 and 2013.[10] (T. 325-28, 329-31, 333-42, 375-82, 757-61, 766-70, 771-80). Rather than further detailing the evidence at the outset, relevant details regarding the medical opinion and other evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV. <u>ALJ'S DECISION</u>

After finding that plaintiff met the insured status requirement through June 30, 2013, the ALJ noted that despite alleging a disability onset of October 28, 1984,

---

[10] The ALJ noted in his decision that this was plaintiff's sixth application for disability benefits. (T. 399). Thus, he has had various consultative examinations throughout the time that he has applied for benefits.

plaintiff engaged in substantial gainful activity for many years after that date.[11] (T. 399). The ALJ found the following severe impairments at step 2 of the disability analysis – status post partial amputation of plaintiff's thumb and first, second, and third fingers of plaintiff's left (non-dominant) hand; asthma; a learning disorder (Not Otherwise Specified ("NOS"); borderline intellectual functioning; and depressive disorder (NOS). (T. 400).

In determining severity at step 2, the ALJ first noted that a psychological report from plaintiff's school in 1978 revealed that plaintiff's verbal IQ was 78; his performance IQ was 92; and his full scale IQ was 84. (T. 400). The report stated that plaintiff refused to do his assignments, was content to put forth minimal effort, and was not eligible for placement in special classes. (*Id.*) The ALJ then reviewed the medical evidence from plaintiff's 1984 hospitalization after his hand injury, together with plaintiff's subsequent physical consultative examinations. (T. 400-401).

The ALJ discussed plaintiff's mental impairments by reviewing the consultative examiners reports by Dr. Wayne Von Bargen, Ph.D.; and Cheryl Loomis, Ph.D. (T. 401-402). The ALJ also found that plaintiff had been "medically managed" for tendonitis in both arms; insomnia; a history of poly-substance abuse; and "smoking

---

[11] Plaintiff's counsel has made it clear that plaintiff is only seeking benefits as of January 1, 2008 because of plaintiff's demonstrated ability to engage in substantial gainful activity prior to that time. In any event, the ALJ stated that his findings addressed the periods in which plaintiff did not engage in substantial gainful activity.

cessation," but that none of these conditions were severe. (T. 402).

At step 3, the ALJ found that plaintiff's impairments did not meet or medically equal any Listed Impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (T. 402-403). In making this determination, the ALJ considered Listing 1.02B (Major Dysfunction of a Joint). (T. 403). Notwithstanding plaintiff's amputation, he did not meet the requirements of the listing. The ALJ also considered Listings 3.02 (chronic pulmonary insufficiency) and 3.03 (asthma). (T. 403). The ALJ found that the plaintiff's respiratory condition did not result in spirometry findings that were low enough to meet the requirements of the listings. (*Id.*) There was also no evidence to show that plaintiff experienced the requisite number of asthma attacks required for a listed impairment. (*Id.*)

With respect to plaintiff's mental impairments, the ALJ considered Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), 12.05 (Intellectual Disability), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance addiction disorders). (T. 403-406). The ALJ found that plaintiff has mild restrictions in activities of daily living; moderate restrictions in social functioning; mild difficulties with concentration, persistence, and pace; and no episodes of decompensation. (T. 404-405). Because plaintiff's mental impairments did cause two "marked" limitations or one "marked" limitation and repeated episodes of decompensation, each of extended duration, plaintiff did not meet the "paragraph B" criteria in Listings 12.02, 12.04,

12.06 and 12.09 or the "paragraph D" criteria of Listing 12.05. (T. 403). The ALJ also considered whether plaintiff met the "paragraph C" criteria of Listings 12.02 or 12.04 which require repeated episodes of decompensation (each of extended duration) or a condition resulting in such a marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause decompensation or that the plaintiff was unable to function outside a highly supportive living arrangement. (T. 405). The ALJ found that plaintiff did not meet these requirements. (*Id.*)

The ALJ then considered plaintiff's cognitive impairments under Listing 12.05, even though four consultative psychiatric examiners declined to assign a diagnosis of mental retardation. (T. 405). The ALJ found that the listing requires that in addition to the significantly sub-average intellectual functioning, Listing 12.05 requires that the individual demonstrate deficits in adaptive functioning both as a child and as an adult. (T. 405). The ALJ found that plaintiff has no limitations in adaptive functioning, thus, he does not meet Listing 12.05. (T. 405-406).

At step 4, the ALJ found that plaintiff has the RFC to perform light work as defined in the regulations because he is able to lift and/or carry twenty pounds occasionally and ten pounds frequently with his dominant right hand, although he must use his left hand primarily to steady the load he lifts with the right. (T. 406). With his left hand and upper left extremity, however, plaintiff can only push and pull ten pounds

occasionally and less than ten pounds frequently. He can never finger with the left hand. He is able to constantly reach in all directions with both arms, he cannot climb ladders, ropes, and scaffolds. The ALJ found that plaintiff can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Plaintiff can stand and/or walk as well as sit for six hours in an eight-hour workday, but he must avoid concentrated exposure to respiratory irritants. (T. 406). He retains the ability to understand, remember, learn, and perform new and simple tasks. Although he has a mild difficulty attending to a routine, maintaining a schedule, and making appropriate simple work-related decisions, he is able to occasionally interact with the public and co-workers. (*Id.*)

In making this determination, the ALJ considered plaintiff's testimony about the activities that he could perform, including playing games on a computer; draining the oil and changing a filter on his car, vacuuming, doing his own laundry, preparing meals, going shopping, driving four-wheelers, and caring for all of his personal hygiene needs. (T. 407). Plaintiff testified that he has not participated in any mental health counseling or treatment since 1984, he takes no medication, and he has not used an inhaler for his asthma since the mid-1990s. The ALJ pointed out that plaintiff testified that his left hand is the only thing that keeps him from working. (T. 407). The ALJ found that to the extent that plaintiff alleged greater limitations, he was not fully credible.

The ALJ engaged in a detailed discussion of plaintiff's mental impairments and

the limitations that they cause, but found that plaintiff has had the same mental and physical impairments for many years and has been able to work at many different occupations. (T. 408). The ALJ also noted that plaintiff told a consultative examiner as late as 2013 that plaintiff "recently" worked at Five Mile Point race track "'operating trucks, backhoes, and heavy equipment," and that he does this "seasonally." (*Id.*) In making his determination regarding plaintiff's physical abilities, the ALJ relied upon non-examining physicians, Fernando R. Montoya, M.D. and Sury Putcha, M.D., who is a board-certified orthopedic surgeon. (T. 409). The ALJ relied upon Dr. Alan Dubro, Ph.D.'s finding that plaintiff could follow, understand, attend to, and remember directions and instructions, notwithstanding his mildly impaired attention and concentration. (*Id.*) Dr. Dubro also found that plaintiff could interact appropriately with others and is capable of making appropriate decisions. (*Id.*) Dr. Iman-Dundon found that plaintiff was able to complete unskilled to semi-skilled work, "not working closely with others."' (*Id.*)

The ALJ also gave great weight to the school psychologist, Dr. Von Bargan and Dr. H.M. Bacchus, due to their expertise and the relative consistency of their opinions with the overall medical evidence. Even though these reports did not include a function-by-function assessment, Dr. Bacchus stated only that plaintiff "may" have difficulty with pushing, pulling, and carrying, and he opined that plaintiff retained the ability to perform light to moderate duties using mainly his upper right extremity. (T.

410).  Dr. Von Bargen stated that plaintiff was a better visual learner, but did not identify any specific work-related functional limitations related to the ability to read. (*Id.*)

The ALJ gave reduced weight to Dr. Justine Magurno, Dr. Loomis, and Dr. Moore because their opinions were not fully consistent with the medical evidence and were based on examinations occurring "well after his current application filing date of July 27, 2009," with no medical evidence of a worsening of his condition (*Id.*)  The ALJ gave no weight to the opinions of Mary Corwin because there is no evidence that she is an acceptable medical source or that she even examined plaintiff. (T. 410).

Although at step 4, the ALJ found that plaintiff could perform his prior work, it is conceded by all parties that this was an erroneous finding.  However, the ALJ discussed the VE's testimony in an alternative holding. (T. 411-13).  The ALJ found that plaintiff could perform the requirements of two "representative occupations" such as Bakery Worker, Conveyor Line and Cleaner, Housekeeping.  The ALJ found that notwithstanding the cross-examination of the VE by plaintiff's counsel regarding the statistics on the number of jobs available, the VE's opinion was still sufficient evidence that there were a significant number of jobs available that the plaintiff could perform. (T. 412).  The ALJ discussed the argument that the DOT is obsolete as a source of vocational information, but the Social Security Regulations still mandate reliance on the DOT, together with testimony by a VE when necessary. (*Id.*)  Thus, the ALJ found

that plaintiff was not disabled.

The Appeals Council declined to accept jurisdiction over the case, notwithstanding plaintiff's argument that the VE's numbers were artificially inflated. (T. 386-87). The Appeals Council agreed with the ALJ's finding that, notwithstanding any possible erosion of the number of jobs mentioned by the VE, there were still significant numbers of jobs that plaintiff could perform. (T. 387).

## V.     ISSUES IN CONTENTION

Plaintiff raises the following issues for this court's review:

(1)     The ALJ's RFC assessment is not supported by substantial evidence. (Pl.'s Br. at 7-17) (Dkt. No. 13).

(2)     The ALJ improperly concluded that plaintiff could perform his past relevant work. (Pl.'s Br. at 17-20).

(3)     The ALJ erred at step 5 in determining that there were a substantial number of jobs that plaintiff could perform. (Pl.'s Br. at 20-23).

The defendant concedes that the ALJ's finding at step 4 that plaintiff could return to his past relevant work was error. (Def.'s Br. at 13) (Dkt. No. 17). However, defendant argues that the error was harmless because the ALJ made an alternative holding at step 5 and argues that the rest of the ALJ's determination is supported by substantial evidence. Because the defendant has conceded that the ALJ erred at step 4, the court will address only plaintiff's first and third arguments. For the following reasons, this court finds that the Commissioner's decision at step 5 is not supported by substantial evidence and will order a remand for the Commissioner to make a proper

19

determination of whether there are a substantial number of other jobs that plaintiff can perform.

## VI. <u>RFC</u>

### A. **Legal Standards**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical

facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## B. Application

### 1. Physical Limitations

Plaintiff argues that the ALJ erred in determining that plaintiff could pull up to 10 pounds "occasionally" or less than ten pounds "frequently" with his left hand. (Pl.'s Br. at 8-10). Plaintiff discusses the meaning of occasionally and frequently and reduces these abilities to number of hours per day. (*Id.*) Plaintiff states that "[a]s a matter of common sense, someone with no thumb or fingers, except for the pinky finger cannot engage in pulling, cannot pull 10 pounds, and certainly cannot do so frequently." (*Id.* at 8). The ALJ did not find that plaintiff could pull 10 pounds frequently. He stated that plaintiff could pull "up to" ten pounds "occasionally" and "less than ten pounds" "frequently."[12]

The ALJ cited a September 24, 2009 report by Dr. H.M. Bacchus[13] who found that plaintiff's grip strength was 5/5 on the right, but 0/5 on the left. (T. 330). Plaintiff had "minimal thumb and pincer movements on the left, and fine finger manipulation

---

[12] Plaintiff may have miswritten the ALJ's RFC determination in this sentence. In the first paragraph of his brief, counsel correctly cites the determination that plaintiff could pull up to ten pounds occasionally and less than ten pounds frequently. (Pl.'s Br. at 8).

[13] Other than the surgeon who operated on plaintiff's hand, plaintiff has no treating physicians for either his physical or his mental impairments. All of the medical reports in this case have been generated at the request of the agency in conjunction with plaintiff's seven applications for disability benefits since 2006.

was absent on the left. (*Id.*) Nonetheless, Dr. Bacchus found that plaintiff "appears to retain the functional capacity to perform light to moderate duties, using mainly his [right upper extremity]." (*Id.*) He stated that plaintiff "may" have "difficulty with repetitive pushing, pulling, and carrying." However, Dr. Bacchus also stated that plaintiff "appears to have compensated well over the years." (*Id.*)

Plaintiff cites Dr. Justine Magurno's November 6, 2012 consultative report, in which the doctor found that plaintiff had "marked limitations" for pulling and "moderate" limitations for pushing on the left, with marked limitations for fine motor skills on the left. (T. 761). The plaintiff states that the ALJ should have given Dr. Magurno's report greater weight and should have determined that plaintiff was unable to pull with his left hand at all. In determining plaintiff's RFC, the ALJ did consider Dr. Magurno's report, and he stated that "Dr. Magurno's 'marked' left upper extremity limitations have been accounted for within the above-listed [RFC] assessment." (T. 410).

The ALJ weighed any conflicting evidence and determined that plaintiff could pull less than ten pounds frequently. There is no question that plaintiff cannot use the remaining pinky finger and partial thumb on his left hand to grip and pull. State Agency reviewing physician, Dr. Fernando Montoya also noted that plaintiff had 0/5 grip strength in his left "hand," but found 4/5 strength in his "upper extremities." (T. 358). The ALJ's statement implies that he did not find that Dr. Magurno's reference to "marked" limitations indicated a complete inability to pull. In addition, the ALJ stated that plaintiff could pull with his left hand **and** upper left extremity, not only with his

left hand. (T. 406). Pulling does not necessarily have to occur by gripping an object, particularly one that weighs less than ten pounds. As the ALJ stated, Dr. Magurno's limitations were considered and factored into the ALJ's RFC determination.

In addition, the ALJ considered plaintiff's work history as well as his testimony about his daily activities. Plaintiff's injury occurred in 1984, when he was nineteen years old, but he continued to work at various jobs, until at least the end of 2007, most of which required a great deal more strength than the jobs cited by the VE at the ALJ hearing. The ALJ also cited plaintiff's testimony that he could still drain the oil and change the filter in his car, vacuum, do his own laundry, prepare meals, go shopping, drive four-wheelers, and care for his own personal needs. (T. 407). In fact, during plaintiff's February 4, 2013 consultative intelligence evaluation by Mary Ann Moore, Psy. D., – a report that plaintiff argues should have been given more weight – plaintiff told Dr. Moore that, even though his last "full employment" was in 2007, "over the summer of 2012, he worked at Five Mile Point Race Track operating trucks, backhoes, and heavy equipment," and that he did that "seasonally." (T. 771). The ALJ was entitled to take plaintiff's statements to Dr. Moore into consideration when determining plaintiff's RFC and credibility.[14] The ALJ noted that plaintiff's stated activities involved "many of the same physical and mental functions that the claimant argues that he cannot perform in a workplace setting." (T. 408).

It is clear that the ALJ took the conflicting information into consideration when

_____

[14] Although plaintiff does not have a specific section of his brief in which he argues that the ALJ's credibility determination was flawed, the court notes that plaintiff's "partial" credibility played a part in the ALJ's RFC determination. (T. 407, 408).

he determined plaintiff's RFC, both physical and mental. Weighing conflicting evidence in making an RFC determination is the province of the ALJ. *Veino v. Barnhart*, 312 F.3d at 578, 588 (2d Cir. 2002). In this case, the ALJ analyzed the conflicting evidence, and his determination that plaintiff could still pull less than ten pounds frequently with his left hand and upper extremity is supported by substantial evidence.

### 2.    Mental Limitations

Plaintiff argues that the ALJ did not properly analyze and include in his RFC, the limiting effect of plaintiff's mental impairment when determining that plaintiff could engage in substantial gainful activity. Plaintiff claims that he has greater than "mild" limitations in his ability to attend to a routine, maintain a schedule, make appropriate workplace decisions, and interact with the public and co-workers. Plaintiff also argues that he cannot adequately deal with workplace stress. In making these arguments, plaintiff claims that the ALJ improperly weighed the medical opinions. (Pl.'s Br. at 10-17).

In determining that plaintiff could make appropriate workplace decisions, the ALJ relied upon the January 4, 2011 consultative assessment of Dr. Alan Dubro, Ph.D. (T. 375-82). The ALJ also relied upon the November 19, 2012 non-examining consultative review by Dr. Iman Dunton, M.D., who found that plaintiff could complete unskilled to semi-skilled work, not working with others. (T. 532, 762-63). The ALJ also gave significant weight to the school psychologist, Dr. VonBargen, who performed intelligence testing when plaintiff was in high school. (T. 323-28, 409-410).

The ALJ stated that his RFC determination was consistent with, and supported by, the observations of the medical sources in the record. (T. 409). Plaintiff does not question his IQ scores, rather he states that the more recent evidence shows that he has trouble getting along with co-workers and cannot make appropriate decisions in a work environment. Plaintiff argues that the ALJ erred in giving more weight to Dr. Dubro's 2011 report than on the more recent psychological examinations by Dr. Cheryl Loomis and Dr. Moore. The ALJ gave reports by Dr. Loomis and Dr. Moore less weight because they were not consistent with the longitudinal medical evidence, and were based on examinations long after plaintiff's 2009 application date "with no medical evidence of a worsening in his condition." (T. 410). In addition, the ALJ noted that the limitations in Dr. Loomis's and Dr. Moore's reports were taken into consideration in the RFC evaluation, that the limitation on plaintiff's socialization does not rise to the "marked" level, and that the record shows that he interacts well with the medical personnel during examinations. In addition plaintiff has not received, and does not currently receive any mental health treatment. (T. 410).

The ALJ's determination, and the weight that he gave to the doctors' reports, is supported by substantial evidence. On January 4, 2011, Dr. Dubro found that plaintiff could follow, understand, attend to, and remember simple instructions, his attention span and concentration were "mildly" impaired as was his memory, and his ability to regularly attend to a routine and maintain a schedule. (T. 377). Dr. Dubro found that plaintiff was capable of making appropriate decisions. (*Id.*) Dr. Dubro noted that plaintiff displayed a history of "moderate" learning disability, but could perform daily

tasks independently on a regular basis. (*Id.*)  Dr. Dubro stated that plaintiff "does interact appropriately with others." (*Id.*)

Dr. Loomis's November 6, 2012 report states that the plaintiff was "cooperative" though "slightly hostile," however she found that he had "adequate overall social skills." (T. 767).  He was coherent and "goal directed" with no evidence of thought disorder. (T. 768).  His attention and concentration were "intact," and his recent and remote memory skills were only "mildly impaired." (*Id.*)  His intellectual functioning was average to below average, with an "appropriate to experience" fund of knowledge. (*Id.*)  Dr. Loomis stated that plaintiff "reportedly socializes with friends and family on occasion," but that he typically stays home and smokes cigarettes. (*Id.*)  His family relationships were "okay," although he did not see his children often, and he reported a "good" relationship with his brother and sister-in-law. (T. 769).

Dr. Loomis found that plaintiff could follow and understand simple directions and instructions and perform simple, but not complex, tasks independently.  That is not inconsistent with Dr. Dubro's report or with the ALJ's RFC.  It is unclear how Dr. Loomis then determined that plaintiff could not make appropriate decisions, relate adequately with others, or appropriately deal with stress because in the next paragraph, she states that "[t]he results of the present examination appear to be consistent with psychiatric and cognitive problems, but in itself [sic], these do not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (T. 769).  Dr. Loomis recommended individual psychological therapy, vocational

rehabilitation, and possible CASC[15] evaluation.

Three months later, on February 4, 2013, psychologist, Dr. Moore consultatively examined plaintiff. (T. 771-76 (narrative report), 777-80 (mental RFC)). In the "Background Information" section of Dr. Moore's report, she wrote that plaintiff reported working at a race track in 2012, where he operated trucks and heavy equipment, but that he had an argument with the manager and became "physically aggressive," when the manager pushed him. (T. 771). Plaintiff reported that he lost "numerous" jobs because of his attitude, "throwing objects," and becoming verbally aggressive.

The court notes that this is the first time that plaintiff has reported such aggression. While he testified that he lost jobs due to his "attitude," he testified at his 2011 hearing that he lost his foreman job in 2007 because he wanted to go and say goodbye to some women when he was told not to go.[16] (T. 100). He also testified at his 2013 hearing that he would develop an "attitude" problem when he thought that he and others were not being treated fairly. (T. 446-47). Plaintiff also reported for the first time to Dr. Moore, contrary to all other reports, that he "believes" that he was psychiatrically hospitalized in the early 1990s after an attempted overdose. (T. 771). He told Dr. Moore that he was hospitalized for "a week or two," and given medication, the name of which he could not remember. (*Id.*) However, plaintiff then stated that he

---

[15] "CASC" refers to "Credentialed Alcoholism and Substance Abuse Counseling. https:/www. oasis.ny.gov/sqa/credentialing/CASACreq.cfm.

[16] Plaintiff testified that he was fired because he "didn't listen." (T. 100).

never received any outpatient counseling or psychiatric treatment after that time. (*Id.*)

Plaintiff's statements about his overdose attempt, psychiatric hospitalization, and substance abuse were contrary to all the previous statements that he made to medical personnel. In the section of Dr. Loomis's report entitled "PSYCHIATRIC HISTORY," the first entry reads – "Hospitalizations: None." (T. 766). He also told Dr. Loomis that he drank alcohol on occasion and "rarely" used marijuana and cocaine "years ago," while he told Dr. Moore that he began drinking as a teenager, and that in the 1990s, he drank from "sun up to sun down," including at work, where he would often drive heavy machinery while intoxicated. (T. 767). Dr. Dubro also reported that plaintiff's only hospitalization was for his hand injury, and his inability to work was due to his "learning disability." (T. 375). Plaintiff told Dr. Moore that he had "anger issues," and that was part of the psychological reason that he could not work. (T. 771). Plaintiff also told Dr. Moore and Dr. Loomis that he spent 18 months in jail for robbery in 1984, while he denied any "Legal History" in Dr. Dubro's report.[17] (T. 376).

Plaintiff's counsel argues that plaintiff's mental health has gotten worse. However, it appears that what was getting worse was the description of his mental health history to the psychologists. The plaintiff's new explanation of why he was fired from previous jobs and the description of his allegedly violent legal past could certainly influence the psychologists' findings regarding plaintiff's ability to relate to others, his insight, his judgment, and his ability to make appropriate decisions.

---

[17] Plaintiff testified in his 2011 hearing tht he had been convicted of Robbery and spent 18 months in prison. (T. 108-109). Plaintiff also told Dr. Loomis and Dr. Moore that he spend 30 days in jail for failure to pay child support. (T. 767, 772).

The ALJ weighed the medical opinions, and in addition to weighing the opinions, determined that plaintiff was only partially credible. The ALJ did not doubt that plaintiff had physical and psychiatric symptoms, he simply doubted the extent and the intensity of those symptoms. The ALJ noted that in Dr. Moore's opinion, she stated that although plaintiff's eye contact was "poor initially," it "became more appropriate as the session progressed." (T. 772). Dr. Moore stated that plaintiff was "generally cooperative," and although he appeared "somewhat irritable" and cursed occasionally, it was "never directed toward [Dr. Moore]." (T. 773). He completed all the tasks without questioning, and "he did not evidence significant emotional distress during the evaluation." (*Id.*) Dr. Moore determined that plaintiff was functioning in the borderline range of intellectual ability. (T. 774).

Dr. Moore concluded that plaintiff could follow and understand simple directions and instructions, could perform simple rote tasks with supervision, and could consistently perform simple tasks. He showed difficulty with attention and concentration, and his memory was impaired, but he could learn simple tasks. She stated that he "may" have difficulty with complex tasks.

Although Dr. Moore stated that plaintiff became "easily overwhelmed" and had "difficulty dealing with stress," that statement is not consistent with her observation that plaintiff completed all tasks without questioning and did not evidence significant emotional distress during the evaluation. There is no statement that plaintiff ever became "overwhelmed" during the examination. Dr. Moore noted that her opinion regarding plaintiff's difficulty relating adequately with others was based on his reported

"long history of anger and verbal and physical aggression toward others." His "anger" as well as his learning disability "may" cause problems with making appropriate work decisions and maintaining a regular schedule. (T. 775). Plaintiff's "long history" was evidenced only by his own description. Plaintiff's characterization of his previous symptoms seemed to get increasingly serious every time he spoke to a new psychological evaluator. Dr. Loomis and Dr. Moore's contemporaneous observations did not support many of their conclusions regarding plaintiff's mental health limitations.

It is true that the ALJ did not consider plaintiff's alleged inability to deal with workplace stress. The court notes that Dr. Loomis and Dr. Moore found that plaintiff could not adequately deal with stress, and Dr. Moore found that plaintiff was easily overwhelmed. However, as stated above, the ALJ gave reduced weight to these two reports. The court finds that although both psychologists found that he could not handle stress and/or became easily overwhelmed, neither psychologist observed such a condition during the examination. In fact, Dr. Moore noted that although plaintiff needed repetition of some questions, his style of responding was "at times careful, at times careless, at times he worked with a great deal of reflection. At other times he worked more rapidly. He did show some distractability. . . . He did not evidence significant emotional distress during the evaluation." (T. 773). There is no evidence that plaintiff was overwhelmed during the testing or during any part of the evaluation. Thus, it is unclear how Dr. Moore determined that plaintiff was easily overwhelmed.

Dr. Dubro did not mention that plaintiff would have trouble with stress in his

2011 report. Dr. Dubro stated that plaintiff was mildly impaired in recent and remote memory skills secondary to distractibility "associated with nervousness evident when the claimant was asked to perform these tasks." (T. 377). Notwithstanding this distractibility and nervousness, Dr. Dubro found that plaintiff's insight was "good" and his judgment was fair. (T. 377). Dr. Dubro found that plaintiff could follow instructions, and could perform simple and complex tasks, and that he interacted appropriately with others. Secondary to his "learning disability," he might have mild difficulty in his ability to regularly attend to a routine and maintain a schedule.

Because the ALJ gave Dr. Dubro's report great weight, the ALJ did not include a reference to stress in his RFC. However, given the description of plaintiff's abilities in the RFC, the ALJ clearly determined based upon Dr. Dubro's report, that plaintiff could handle the "stress" of working. Neither Dr. Dubro, nor Dr. Loomis found that plaintiff's impairment interfered with his ability to function on a daily basis. (T. 377-78). Plaintiff cites Social Security Ruling ("SSR") 85-15, which states that "[a]ny impairment-related limitations created by an individuals response to the demands of work must be reflected in the RFC. However, Dr. Dubro did not find that plaintiff was limited by stress, and the ALJ did not err in failing to include such a limitation in his RFC.

SSR 85-15 is entitled "The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments." It has been held that SSR 85-15 does not apply in cases, such as this one, where both exertional and non-exertional limitations are present. *See Slattery v. Colvin*, No. 14-CV-6402, 2015 WL 3961159, at

*12 (W.D.N.Y. June 29, 2015) (citing *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012)).  In any event, even if 85-15 were applicable to this case, the ALJ included plaintiff's possible stress-based limitations in his RFC by limiting him to jobs involving simple tasks and only occasional contact with the public and co-workers. (T. 406).  In *Slattery*, the ALJ's RFC limited the plaintiff to unskilled work involving simple instructions where interactions with others are routine, superficial, and incidental to the work performed.  The court found this assessment was "consistent" with the doctor's opinion that plaintiff would have difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress. *Id.* at *13.  In *Slattery*, the court held that the ALJ was not required to specifically and separately address plaintiff's ability to handle stress when the stress-based limitations were reflected in the RFC.

Plaintiff has never had any psychiatric treatment, thus, there are no treating physicians in this case.  All of the psychological reports were submitted by consultative medical sources.  Although plaintiff argues that the opinions of Dr. Loomis and Dr. Moore should be given greater weight because their reports are more "recent," the plaintiff is requesting benefits as of 2008, three years before Dr. Dubro's report, four years prior to Dr. Loomis and Dr. Moore's reports.[18]  Dr. Dubro's report is within the time period of plaintiff's application and thus, the ALJ was justified in considering it and giving it the weight that he did.  The ALJ's RFC is supported by substantial evidence.

---

[18] As stated above, Dr. Loomis's and Dr. Moore's reports were written only three months apart.

## VII.  VE/SIGNIFICANT NUMBER OF JOBS

### A.    Legal Standards

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert.  20 C.F.R. §§ 404.1566, 416.966.  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, generally, the VE is generally asked a hypothetical question that incorporates plaintiff's limitations.  Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion."  *Dumas*, 712 F.2d at 1554. *See also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL

1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

## B. Application

As stated above, the ALJ initially found that plaintiff could perform his prior work, which all parties agree was error. However, the ALJ also proceeded to step 5 of the sequential analysis and utilized a VE to determine that plaintiff could perform a significant number of occupations in the national economy. Plaintiff argues that the number of jobs cited by the VE for one occupation was not a "significant number," and argues that the plaintiff cannot perform the physical requirements of the other occupation.

### 1. Number of Jobs

Courts have held that a "significant number" of jobs is "fairly minimal." *Rosa v. Colvin*, No. 3:12-CV-170, 2013 WL 1292145, at *9 (N.D.N.Y. March 27, 2013) (citing *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009)). Defendant argues that in *Bavaro v. Astrue*, the Second Circuit held that the Commissioner need only show "one" job existing in the national economy that plaintiff could perform. *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011). *Bavaro* does not support defendant's argument in this case. While it is true that the court in *Bavaro* held that the Commissioner need only show that plaintiff could perform one type of job, the court was not discussing whether the particular job existed in "significant numbers" in the national economy. *Id. See also Sullivan v. Astrue*, No. 08-CV-6355, 2009 WL 1347035, at *15 & n.15 (W.D.N.Y. May 13, 2009) (single job is sufficient if it exists in "significant numbers").

Although the court in *Bavaro* did hold that the Commissioner need only show one job existing in the national economy, the court stated that "[a] vocational expert testified to the existence of such jobs at the national and regional level." *Id.* Thus, although the court was referring to one occupation (photo counter clerk), that one occupation existed in significant numbers in the regional and national economy. The court never mentioned how many of the photo counter clerk positions there were in the national and regional economy. *Id.* Apparently, the numbers were significant, notwithstanding "the [alleged] decline of the photofinishing industry." 413 F. App'x at 384.

In this case, at the 2013 hearing, the VE discussed two jobs that she determined that plaintiff could perform with the RFC as stated in the ALJ's hypothetical question – Bakery Worker, and Housekeeper/Cleaner, both light work jobs. As to the Bakery Worker, plaintiff claims that the ALJ misrepresented the number of jobs that were available to plaintiff. (Pl.'s Br. at 20). The VE originally testified that the "employment numbers for this occupational group nationally is 235,910, and statewide is 3,880," but there was no data available for the Binghamton region where plaintiff lives. (T. 454). Plaintiff's counsel questioned the VE further, and she ultimately testified that the numbers she gave were for the 1,587 different job titles within the DOT classification. (T. 467). Plaintiff's counsel asked if there were numbers for just the one baker title out of 1,587 that plaintiff could perform, and the VE stated that the national number for the one job was 261, and the state-wide number was 4. (*Id.*)

Plaintiff argues that this number is not substantial. This court agrees. In

*Koutrakos v. Colvin*, Magistrate Judge Joan Margolis discussed the "significant numbers issue" and reviewed the some of the case law discussing whether "significant numbers" existed. *Koutrakos v. Colvin*, No. 3:13-CV-1290, 2015 WL 1190100, at *20-22 (D. Conn. Mar. 16, 2015). Magistrate Judge Margolis first pointed out that "[n]either the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a 'significant' number of jobs." *Id.* at *21. The court is generally guided by numbers that have been found "significant" in other cases. *Id.* (citing *Schadenfroh v. Colvin*, No. 09-CV-223, 2014 WL 1260123 (S.D. Ind. Mar. 27, 2014)).

Significant numbers include 408 jobs in the regional economy and 98,008 jobs in the national economy; and 180 jobs in the regional economy and 40,027 jobs nationally. *Barbato v. Astrue*, No. 09-CV-6530, at *7 (W.D.N.Y. July 7, 2010) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (1400 jobs was significant)[19] (citing cases); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs in the local economy, 1600 in the state, and 80,000 in the national economy were significant); *Dumas v. Schweiker*, 712 F.2d 1545, 1549, 1553-54 (2d Cir. 1983) (150 jobs in the local economy and 112,000 in the national economy)). In *Fox*, *supra*, the court found that 200 surveillance system monitor jobs in the Central New York Region were significant. *See also Roe v. Colvin*, No. 1:13-CV-1065, 2015 WL 729684, at *7

---

[19] Although the court in *Lee* did not specify that it was referring to the "local" economy, the case that it cited for the proposition that 1350 jobs was "significant" was a case in which the number was referring to numbers in the local economy. 988 F.2d at 794 (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)).

(N.D.N.Y. Feb. 19, 2015) (630 jobs locally and 44,000 nationally was significant); *McCusker*, 2014 WL 6610025, at *3 (100 jobs in the Capital Region; 2,250 in New York State, and 74,470 nationally was significant); *Gray v. Colvin*, No. 12-CV-6485, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (60 jobs regionally, but over 16,000 nationally was significant).

In *Vining v. Astrue*, 720 F. Supp. 2d 126, 136 (D. Me. 2010), the court found that "assuming" that 30 jobs in the state of Maine is ***not*** a "significant" number in the region where plaintiff lives," 11,000 nationwide was a "significant number in several other regions of the country." However in *Leonard v. Heckler*, 582 F. Supp. 389, 391 (M.D. Pa. 1983), the court held that 4,000 to 5,000 jobs nationwide was ***not*** a significant number, given that it was "a minuscule fraction of the number of jobs existing in the national economy." The court in *Vining* estimated that "numbers of jobs in the ballpark of 10,000 to 11,000 nationwide have been held 'significant.'" 720 F. Supp. 2d at 136 (citing inter alia *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (200 jobs in Iowa and 10,000 nationally was significant); *McGee v. Astrue*, No. 08-831, 2009 WL 2841113, at *6 n.14 (W.D. La. Aug. 28, 2009) (150 jobs in Louisiana and 18,760 nationally was found significant)). In *Beltran v. Astrue*, 700 F.3d 386, 389-90 (9th Cir. 2012), the court found that 135 regional jobs and 1,680 national jobs was not significant. The court specifically stated that "[a]lthough 1,680 jobs might seem a 'significant number' standing alone, distributing these jobs between several regions across the nation shows that it is not 'significant' after all."

Based upon the case law above, 261 jobs nationally would not be considered a

significant number.  Plaintiff argues that the ALJ did not even mention the reduced

number to which the VE testified.  While the ALJ did not mention the reduced numbers

specifically, he stated that he gave "due consideration to the cross-examination of the

[VE] by the claimant's representative." (T. 412).  The ALJ concluded that "even though

the statistics regarding the available number of jobs cited by the [VE] apply to large

classifications containing multiple job titles, the [VE's] opinion is still sufficient

evidence that there are a significant number of jobs in the national economy that

claimant could perform." (*Id.*)  Thus, it is clear that the ALJ did consider the reduction

in jobs to which the VE testified, and although this court finds that the bakery worker

numbers are not significant, even the "reduced" numbers for the Housekeeper/Cleaner

position are significant.[20]

---

[20] Recent cases have extensively discussed the issue of a "significant number of jobs." *See Vandermark v. Colvin*, No. 3:13-CV-1467, 2015 WL 1097391, at *12-17 (N.D.N.Y. Mar. 11, 2015) (adopting Rep.-Rec.)  In *Vandermark*, the plaintiff challenged the number of jobs cited by the VE.  The court noted that the DOT "lists skills and occupations and establishes skill levels and exertional capacities required to perform . . . jobs." *Id.* at *12.  The DOT codes are useful for determining the "type" of work that a disability applicant can still perform, but the DOT only defines jobs, it does not report how many such jobs are available in the national economy, and a VE must obtain additional information to determine whether the positions exist in the national economy in significant numbers. *Id.* (citing *Brault*, 683 F.3d at 446-48).  The methods by which this additional information is obtained has been challenged in other circuits. *Vandermark*, 2015 WL 1097391 at *13 (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005)).  However, in *Bayliss*, the court determined that the VE's expertise provides the necessary foundation for accepting his or her testimony. *Id.*  The court in *Brault* ultimately determined that the ALJ did not have to find specific numbers of jobs, all he had to do was find that "substantial positions exist." *Id.* (citing *Brault*, 683 F.3d at 450).  In *Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009), the court noted that although the VE acknowledged that the data on which she relied in determining the existence of 'charge account clerk' positions in the DOT "also encompassed approximately 59 other DOT titles, *viewed in context, it is apparent that the expert arrived at her figures for charge-account clerk positions by discounting from the total number for all 60 DOT titles.*" *Id.* (emphasis in original).  In *Fox v. Commissioner of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *3 (N.D.N.Y. Feb. 13, 2009), Magistrate Judge Randolph Treece found for the Commissioner where the VE testified that he could not report the exact number of surveillance system monitor jobs available in the economy because no publication listed that figure although

With respect to the Housekeeper/Cleaner position, the national number for the "one" DOT code identified by the VE was 132,291, the state-wide number was 7,594, and the regional number was 74. (T. 463). Although this was certainly a reduction from the original numbers which were 877,980 jobs in the national economy, 50,380 jobs state-wide, and 490 jobs in the region, the new numbers were still a significant amount of jobs for purpose of step 5 of the disability analysis. *See e.g. Dumas*, 712 F.2d at 1549, 1553-54 (150 jobs in the local economy and 112,000 in the national economy); *Roe*, No. 1:13-CV-1065, 2015 WL 729684, at *7 (630 jobs locally and 44,000 nationally was significant).

### 2. Ability to Perform Housekeeper/Cleaner Job

Plaintiff recognizes that the numbers for the Housekeeper/Cleaner are significant. However, plaintiff also argues that the VE "testified" that the housekeeper/cleaner job required occasional fingering that would be "bilateral and constant." (Pl.'s Br. at 22). Plaintiff argues that because he obviously could not finger with his left hand, the entire DOT title would be eliminated. (*Id.*) Plaintiff claims that the VE agreed that if plaintiff could occasionally handle with the left hand, but never finger with the left hand, the housekeeping jobs would be eliminated. (Pl.'s Br. at 22) (citing T. 469, 470).

The court would point out that the ALJ's hypothetical question took into account

---

surveys conducted by the Department of Labor and the State showed 132,980 "protective service" jobs in the national economy and 200 in New York State. The VE in *Fox* stated that based upon his best estimate, the number of "surveillance system monitor" jobs was a "'small percentage lower.'" *Id.* Judge Treece found that even if the number of jobs cited by the VE were reduced by a "small percentage," the number would still be significant. *Id.* In this case, however, the revised number stated by the VE in response to counsel's question regarding the Bakery Worker position was not "significant" according to previous case law.

plaintiff's inability to finger with the left hand and only occasionally handle with the left hand, while having the ability to constantly handle, finger, and feel with the right hand. (T. 453). In fact, the ALJ repeated "occasionally handle and feel with the left hand, but no fingering with the left hand." (T. 453). With these clear limitations, the VE specified the bakery worker, conveyer belt and housekeeper/cleaner jobs. (T. 454-55).

Plaintiff's counsel's first question asked the VE to assume greater mental limitations, to which the VE responded that the jobs would be eliminated. However, as stated above, the ALJ's RFC regarding plaintiff's mental limitations is supported by substantial evidence, and plaintiff's attempt to add "marked" limitations to the hypothetical cannot succeed. Then plaintiff's counsel asked about the amount of "fingering" required in the housekeeper/cleaner job. (T. 461). The VE stated that fingering would be "occasional." Plaintiff's counsel asked: "Okay, and that's bilateral, correct?" To which the VE first responded "That would be my understanding . . . . constantly." (*Id.*)

However, the VE then stated: "Well – that depends, I guess. I can't – I – I can't – **it's not defined as bilateral. It just says occasional fingering**." (*Id.*) (emphasis added). Then the VE agreed that if plaintiff could not occasionally finger with his left hand, "there would be erosion, at worst, there wouldn't be jobs, correct?" (T. 462). The VE stated that this was "correct," and plaintiff's counsel asked/stated "And there would be no way to say how much the erosion was, is that correct?" The VE agreed that was correct. (*Id.*)

Later, plaintiff's counsel attempted to further limit the RFC by asking the VE if the housekeeper/cleaner job would still be available if plaintiff could not occasionally "handle" with his left hand. (T. 469). In this case, the VE stated that the inability to occasionally "handle" with his left hand would "eliminate the housekeeper/cleaner job. (T. 469). The ALJ then attempted to clarify the VE's testimony and asked about handling with the left hand. He asked the VE whether there would be "any significant erosion" to those two jobs if the individual had no limitation on the right, could occasionally handle with the left, but never finger with the left. (T. 469-70). The VE testified that the Bakery worker/conveyer line would "still be a job" that would fit into the RFC. (T. 470). The VE never specifically answered the question about whether there would be "significant erosion," of the Housekeeper/Cleaner jobs. Instead the VE stated that the bakery worker job would still be available, which could imply that the Housekeeper/Cleaner positions were either significantly eroded or "eliminated."

When plaintiff raised this issue in the Appeals Council, the Administrative Appeals Judge stated that "the vocational expert testified that the occupation base would only be eroded but not eliminated." (T. 387) (citing Hearing Recording at 4:49:40 p.m.) Although it is unclear where to what exact testimony the Appeals Council is citing because the court does not have the recording, and the transcript does not have exact time references, the VE testified as follows:

> Q    So if he can't do that with his left hand then at best there would be erosion, at worst, there wouldn't be any jobs, correct?
>
> A.    Correct.

Q    And there would be no way to say how much the
     erosion was, is that correct?

A.   Correct.

(T. 462).  Later, in the testimony, counsel again brought up the issue of handling with

the left hand. (T. 468-469).  In an attempt to clarify the situation, the ALJ also asked

additional questions:

ALJ:  Okay, well again, to just cover this handling with
      the left hand?  Would jobs that – the two jobs
      that you identified if they could occasionally
      handle with the left and and the only limitation is
      fingering to the left hand could never, and there's
      no limitation to the right hand, would there be
      any significant erosion to those two jobs based
      on your professional opinion?

VE:   Okay, so you're limiting – I'm sorry, you're limiting –
      there's – you're saying there's no fingering, but
      occasional handling?

ALJ:  And feeling, to the left hand?

VE:   And feeling, okay.  Bakery worker/conveyer line would
      be – still be a job.  That would – fit into that RFC.  Let
      me check real quick.  Okay, and you're saying
      occasional?

ALJ:  Yes.

VE:   Feeling.  I just want to make sure I'm clear before I
      give my –

(T. 470).  The rest of the discussion involved the VE attempting to make sure that the

Bakery worker position would still be available, and the ALJ stated that with the left

42

hand there was only occasional handling and feeling, but no fingering, while he could constantly do all of these functions with his right hand. (T. 470). The VE again mentioned that there was no defining "which hand," and the ALJ told the VE not to "speculate." (T. 471). The VE then stated that she was "not really able to identify that based on that." (*Id.*)

There was no further questioning either by the ALJ or by plaintiff's counsel. (T. 471). As stated above, there are not significant numbers of bakery worker jobs, and there would have to be a very significant erosion to eliminate the Housekeeper/Cleaner classification as having a significant number of jobs. However, based on the equivocal testimony of the VE, it is impossible to determine whether the number of jobs cited by the VE would be significantly eroded or eliminated, given plaintiff's inability to finger with the left hand. Thus, the Commissioner's determination at step 5 is not supported by substantial evidence and must be reversed.

## VIII. <u>NATURE OF REMAND</u>

### A. **Legal Standards**

Remand to the Commissioner for further development of the evidence is appropriate when there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). Reversal for calculation of benefits is appropriate only if the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no useful purpose. *Id.*

## B.    Application

In this case, although the ALJ's "alternative" step 5 determination is not supported by substantial evidence, it is completely unclear that plaintiff would not be able to return to some substantial gainful activity, given his stated activities and his ability to work for many years after his injury.  Even though the VE's numbers for one particular Bakery worker job were not substantial, it is not clear that the VE believed that plaintiff could only perform one job out of the more than 1,500 jobs in the related DOT category.  The testimony regarding the Housekeeper/cleaner position became very confused, and based upon counsel's cross-examination, it appeared that plaintiff could not perform the job.  However, it is not clear that there are no other categories of jobs that plaintiff could perform with only one hand, or that do not require both hands at all times.  The court notes that the loss of one arm or one hand, by itself, does not necessarily rise to the level of disability for purposes of the act. *See Laine v. Comm'r of Soc. Sec.*, No. 07 Civ. 1251, 2013 WL 2896968, at *16, 23 (S.D.N.Y. June 13, 2013) (VE first testified that the lack of bilateral dexterity would narrow the base of light work, but there were still jobs that plaintiff could perform.  The VE also testified that his answer would not change even if the individual had "no use at all of the right upper extremity," because the VE chose jobs which "a person could perform with one arm.); *McAndrew v. Heckler*, 562 F. Supp. 1227, 1232 n.2 (S.D.N.Y. 1983) (citing cases).  Thus, this court will order a remand for additional vocational testimony.[21]

---

[21] The court understands that the ALJ found that plaintiff could "pull" less than ten pounds frequently with his left hand **and** upper extremity, indicating that plaintiff would not necessarily need to use his hand to pull small objects weighing less than ten pounds.  However, on remand, the

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **REVERSED**, and the plaintiff's case is **REMANDED PURSUANT TO SENTENCE FOUR OF 42 U.S.C. §405(g)** for further vocational evidence as discussed above, and it is

**ORDERED**, that the Clerk enter judgment for **PLAINTIFF**.

Dated: October 13, 2015

_Andrew T. Baxter_
**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

Commissioner should also consider and weigh any specific evidence regarding plaintiff's ability to pull with his left upper extremity and discuss that limitation with the VE in addition to asking the VE to consider in the alternative, whether there are a significant number of jobs that plaintiff could perform if he had the use of only the right hand for pulling, or if he had the use of one hand alone for all functions (i.e. no pulling or pushing with the left hand).